# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**DUPLICATION MANAGEMENT, INC.,**                    Chapter 7
    Debtor                                          Case No. 10-17015-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LYNNE F. RILEY, AS CHAPTER 7 TRUSTEE**
    Plaintiff

v.                                                   Adv. P. No. 12-1149

**COUNTRYWIDE HOME LOANS, INC.** and
**BANK OF AMERICA, N.A.,**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Chapter 7 Trustee's "Motion for Summary Judgment as to All Counts of Her Second Amended Complaint," which contains six counts as follows:

> Count I against Countrywide Home Loans, Inc., for unjust enrichment in the amount of $397,361.11, plus prejudgment interest at the rate of 12% per annum from and after the date of the filing of the Complaint commencing this action, i.e., June 13, 2012, to the date of entry of judgment, pursuant to Mass. Gen. Laws ch. 231, § 6C;

> Count II against Countrywide Home Loans, Inc., for money had and received in the amount of $397,361.11, plus prejudgment interest at the rate of 12% per annum from and after June 13, 2012, to the date of entry of judgment, pursuant to Mass. Gen. Laws ch. 231, § 6C;

> Count III against Countrywide Home Loans, Inc., for fraudulent conveyances under 11 U.S.C. § 548, in the amount of $85,205.73, plus prejudgment interest under 28 U.S.C. § 1961(a) from and after June 13, 2012 to the date of entry of judgment;

1

Count IV against Countrywide Home Loans, Inc., for fraudulent conveyances under 11 U.S.C. § 544(a)(1) and Mass. Gen. Laws ch. 109A, § 6, in the amount of $287,040.50, plus prejudgment interest at the rate of 12% per annum from June 12, 2012 to the date of entry of judgment pursuant to Mass. Gen. Laws ch. 231, § 6C;

Count V, for fraudulent conveyances under 11 U.S.C. § 548(a)(1), against Bank of America, N.A., in the amount of $105,221.18, plus prejudgment interest from June 13, 2012 under 28 U.S.C. § 1961(a) from June 13, 2102 to the date of entry of judgment; and

Count VI, for fraudulent conveyance under 11 U.S.C. § 544(a)(1) and Mass. Gen. Laws ch. 109A, § 6, against Bank of America, N.A., in the amount of $105,221.18, plus prejudgment interest at the rate of 12% per annum from June 12, 2012 to the date of entry of judgment pursuant to Mass. Gen. Laws ch. 231, § 6C;

In conjunction with her Motion for Summary Judgment, the Trustee filed two affidavits. Her counsel, Thomas O. Bean, Esq., attached 25 exhibits to his affidavit, including the transcripts of depositions of Michael E. Jenoski ("Mr. Jenoski"), the Debtor's president and sole shareholder, as well as the president and sole shareholder of the Debtor's affiliate, DMI, Inc. ("DMI"); Robert O'Connor ("Mr. O'Connor"), an accountant to the Debtor, DMI, and Mr. Jenoski and his spouse, Anna M. Jenoski; Karen Slyapich ("Ms. Slyapich"), a deposition witness designated by the Defendants; and Lois Queen, the office manager for DMI.

The Defendants, Countrywide Home Loans, Inc. ("Countrywide) and Bank of America, N.A. ("BANA") (collectively, the "Defendants")[1] filed an Opposition to the

---

[1] Countrywide Home Loans Servicing, LP was the servicer of the Mortgage at issue in this adversary proceeding at all time since October 2006. Countrywide Home Loans Servicing, LP changed its name to BAC Home Loans Servicing LP in April 2009. BAC Home Loans Servicing LP merged with and into Bank of America, N.A. in July

Trustee's Motion together with two exhibits and portions of the deposition transcripts of

Mr. O'Connor and Ms. Slyapich.[2]

The Court heard the Trustee's Motion and the Opposition on September 4, 2013 and

took the matter under advisement.   The Defendants maintain that genuine issues of

material fact exist as to whether the Debtor was solvent during the four years prior to the

filing, and as to whether mortgage payments made by the Debtor to the Defendants were

in lieu of compensation for services of Mr. Jenoski in the absence of evidence quantifying

the value of those services.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the order of reference

of the United States District Court.  *See* LR, D. Mass. 201.  This Court has  authority to hear

and enter a final order in this adversary proceeding as the Trustee is seeking to avoid and

recover fraudulent transfers which are core proceedings.  *See* 11 U.S.C. § 157(b)(2)(H).  The

United States Court of Appeals for the Ninth Circuit in Executive Benefits Ins. Agency v.

Arkison (In re Bellingham Ins. Agency, Inc.), 702 F.3d 553, 565-67 (9th Cir.2012), *cert.*

*granted*, __ U.S. ___, 133 S.Ct. 2880 (2013), ruled that bankruptcy courts do not have

authority to finally determine fraudulent transfer actions despite Congress's designation

of fraudulent transfer actions as core proceedings,.  The Ninth Circuit  further held,

---

2011.  The Court shall refer to the recipients of funds from the Debtor as the Defendants.

[2] The Defendants, on January 7, 2013, filed a  two-count, Third Party Complaint
against Michael E. Jenoski and Anna M. Jenoski, seeking contribution and
indemnification in the event they are adjudged liable to the Chapter 7 Trustee.  The
Jenoskis failed to answer or otherwise respond to the Third Party Complaint, and the
clerk has entered defaults against them.

however, that a bankruptcy court may hear and determine and enter final judgments in fraudulent transfer actions with the parties' consent, which may be implied. Id. at 567. *But also* Waldmand v. Stone, 698 F.3d 910 (6th Cir. 2012); Wellness Internat'l Network, Ltd. v. Sharif, 727 F.3d 751 (7th Cir. 2013).

The Defendants have impliedly consented to the authority of this Court to determine the fraudulent transfer counts, although they have not filed proofs of claim, by failing to raise an issue of the Court's authority during this proceeding. In particular, the Defendants impliedly consented by filing an Opposition to the Trustee's Motion for Summary Judgment, and by failing to object to the authority of this Court in that Opposition or at the hearing when the issue was raised by the Court and addressed by the Trustee. The waiver issue is before the Supreme Court but resolution of the instant matter should not await that decision in view of Massachusetts District Court Local Rule 206. If the district court were to disagree as to this Court's authority in the event of an appeal, finding that the Defendants did not consent to the entry of a final order, that court may treat these findings and rulings as proposed. *See* LR, D. Mass. 206 ("The district court may treat any order or judgment of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution."). To the extent the other counts in the Second Amended Complaint are not claims for avoidance of fraudulent transfers, they are related to the bankruptcy case, and the findings and rulings set forth may be considered proposed findings of fact and conclusions of law. *See*

4

28 U.S.C. § 157(c)(1).

The Court now makes its findings of fact and rulings of law pursuant to Fed. R.

Bankr. P. 7052. For the reasons set forth below, the Court shall enter an order granting the

Trustee's Motion.

## II. BACKGROUND

An involuntary Chapter 7 petition was filed against Duplication Management

Incorporated (the "Debtor") on June 28, 2010. On September 3, 2010, the Court entered an

order for relief under Chapter 7, and, thereafter, the U.S. trustee appointed Lynne F. Riley

the Chapter 7 Trustee. On October 20, 2010, the Debtor filed, among other documents,

schedules of liabilities and a statement of financial affairs. It disclosed no assets, except a

valueless employee owned 401(k) profit sharing plan. It disclosed unsecured debt totaling

$382,576. In its statement of financial affairs, the Debtor further disclosed that it ceased

operations on February 26, 2010, although it had earned income of $737,500 in 2010 prior

to the cessation of business and income well in excess of $5 million in 2008 and 2009. The

Debtor also disclosed that Mr. Jenoski was its president, treasurer and sole stockholder.

On June 13, 2012, the Trustee filed a Complaint against Countrywide, thereby

commencing this adversary proceeding. The Trustee subsequently filed  a separate but

related adversary complaint against BAC Home Loan  Servicing, L.P. ("BAC"), namely,

Adv. Pro. No. 12-01223. In December 2012, the Trustee, Countrywide, and BANA, as

successor by merger to BAC, filed a Joint Motion to Allow the Trustee to File a Second

Amended Complaint and for Related Relief. In that joint motion, the parties requested, in

part because Countrywide and BANA (together, the "Defendants") are related entities

represented by the same counsel, that the Trustee be permitted to file a Second Amended

Complaint against the Defendants in this proceeding and that the Second Amended

Complaint relate back in time to the date the Trustee filed her initial Complaint against

Countrywide.   Contemporaneous with filing the joint motion, the Trustee filed her Second

Amended Complaint and the parties filed a Statement of Agreed Facts applicable to this

proceeding.   After the Court allowed the joint motion, the Trustee dismissed the related

adversary proceeding against BAC without prejudice.

## III. UNDISPUTED FACTS[3]

Prior to 2004 through the date it ceased operations on February 26, 2010, the Debtor

was a printing manufacturer in Woburn, Massachusetts.   In January 2001, Mr. Jenoski

purchased his then co-owner's interest in the Debtor and its affiliate, DMI.   At all times

thereafter, Mr. Jenoski was the president and sole shareholder of both the Debtor and DMI.

As part of the purchase price for his then co-owner's interest in the Debtor and DMI, Mr.

Jenoski agreed to pay the co-owner one million dollars.   To obtain that sum, Mr. Jenoski

and his wife borrowed money from Enterprise Bank ("Enterprise").   To secure repayment

of the loan from Enterprise, the Jenoskis granted Enterprise a mortgage on their lake front

home in Meredith, New Hampshire (the "Meredith Property").

A few years later, in October 2004, the Jenoskis refinanced the mortgage they had

---

[3] The Court, in part, has paraphrased the Trustee's Statement of Undisputed Facts while also noting the facts disputed by the Defendants.

6

granted to Enterprise. They executed a promissory note in the amount of $1,223,000.00 (the "Note"), in favor of Omega Mortgage Corp., which was secured by a mortgage (the "Mortgage") on the Meredith Property (the "Loan"). The Jenoskis were co-makers on the Note secured by the Mortgage with respect to the Loan; the Debtor, however, was neither a co-maker nor guarantor of the Note with respect to the Loan, and had no obligation to repay all or any portion of the Loan. Notably, if the minimum payments were made under the adjustable rate Note, the Jenoskis would have been required to make a balloon payment at the end of the repayment period.

From December 2004 through sometime in May 2009, Countrywide held the Note secured by the Mortgage. BAC acquired the Note as part of its acquisition of Countrywide's assets in 2008. BANA's affiliate, BAC, serviced the Note for Countrywide through at least March 2010. BAC merged with and into BANA on July 1, 2011.

Even though the Debtor was neither a co-maker nor guarantor on the Note with respect to the Loan, and thus had no obligation to repay all or any portion of the Loan, the Debtor made payments due each month with respect to the Loan from December 2004 through March 2010. After the commencement of the bankruptcy case, DMI continued to make Mortgage payments, although, like the Debtor, it was neither a co-maker nor guarantor. DMI ceased operations in August 2012.

From December 2004 through early June 2006, the Debtor made monthly payments to Countrywide with respect to the Loan in the total amount of $110,320.61. During the period commencing four years before the petition date and ending when the Note was

7

acquired by BAC in 2008, the Debtor made the payments each month for more than 30 months to Countrywide, totaling $287,040.50. During the period from two years before the petition date through May, 2009, the Debtor made eleven payments to Countrywide totaling $85,205.73. Countrywide credited each monthly payment to reduce the outstanding principal balance due on the Loan.[4]

For invoices due for the months of June 2009 through March 2010, the Debtor made ten separate payments to BAC in the total amount of $105,221.18. BAC credited the payments to reduce the outstanding principal balance due on the Loan.

The Adjustable Rate Rider to the Note afforded the Jenoskis the opportunity to choose one of several payment options each month. For example, in certain months the Jenoskis had four payment options: a minimum payment option, a full-interest payment option, a principal and interest payment option with amortization over 15 years, and a principal and interest option with amortization over 30 years. Accordingly, in some

---

[4] Mr. O'Connor, the Debtor's accountant, testified that the following mortgage payments were made by the Debtor, although the parties agreed to slightly different amounts as set forth in Exhibit 9 to the Affidavit of Trustee's Counsel.

| Year | Account Amount |
|------|---------------|
| 2004 | $5,575.67 |
| 2005 | $94,048.46 |
| 2007 | $105,704.28 |
| 2008 | $92,725.48 |
| 2009 | $121,858.19 |
| 2010 | $21,030.86 |

The parties agreed that the Debtor paid $79,371.32 in 2006 to Countrywide. The Debtor's accountant testified that in 2006, "we charged the payments against his [Mr. Jenoski's] loan account. Mr. O'Connor, however, recognized the "loan" was a capital contribution.

months, the Debtor paid the minimum payment option, sometimes with an additional $1,500 principal payment. At times, it made a fully amortized payment over 30 years, and at other times, a fully amortized payment over 15 years. Accordingly, payment amounts ranged from a high of $10,922.70 to a low of $5,067.30.

Each year, Countrywide and then BAC sent an annual payment notification form to the Jenoskis with respect to the Note. They sent the notification to the Debtor's address at 215 Salem Street, Woburn, Massachusetts, not to the Jenoskis' home address or to the Meredith Property address, notifying them of the payment options for that year with respect to the Note. Each month, Countrywide, and then BAC, at the Jenoskis' request, sent a monthly payment invoice to the Jenoskis referencing the Meredith Property address, to the Debtor's address at 215 Salem Street, Woburn, Massachusetts. Mr. Jenoski would then elect one of the monthly payment options and cause the Debtor to remit a check to Countrywide or BAC, with the payment coupon that Countrywide or BAC had sent to the Debtor's address.

The face of the checks received by Countrywide and BAC from the Debtor contained the words "Duplication Management, Inc." and "Enterprise Bank and Trust Co. In addition, the face of the checks reveal that they were written on the "Accounts Payable" bank account of the Debtor, that the Debtor had an address of 215 Salem Street, Woburn, Massachusetts, that each check in the memo section contained a number matching the number of the Loan, and that the checks were stamped, rather than handwritten, with Mr. Jenoski's signature.

9

The amount of the payment the Debtor made on the Loan each month, the interest rate, whether an additional principal payment was made, and the payment option selected, is reflected in a chart prepared by the Defendants.  Specifically, the charts contain columns with the following captions: Date [Payment] Received, Contractual Paid to Date; Amount Received; Payment Amount; Amount Applied to Principal; Amount Applied to Interest; Escrow Applied Disbursed; Fees Paid; Debtor Suspense; Principal Balance; Escrow Balance; Debtor Suspense Balance; and Comments. The parties' Statement of Agreed Facts tracks the information in the chart.

Neither Countrywide nor BANA provided anything to the Debtor, directly or indirectly, in exchange for the Mortgage Payments the Debtor made on the Loan. Countrywide and BANA have not returned any payments made by the Debtor to them on account of the Loan, even though the Trustee has sued them to recover such payments.

At all times from June 2006 through the Petition Date, Xerox Corporation; the Debtor's landlord,  the 215 Salem Street Trust; and xpedx, a division of International Paper, were unsecured creditors of the Debtor.  The Debtor also scheduled over three dozen other unsecured creditors on Schedule F of its bankruptcy schedules.

The Debtor's liabilities exceeded the fair value of its assets at all times from January 2006 through June 2010. Specifically, the Debtor's balance sheet prepared by its accountant shows that between March 31, 2006 and June 30, 2010, the Debtor's assets never exceeded $1.604 million, and it had negative equity at all times of at least $468,000, unless, as the Defendants' assert, the Debtor's balance sheet were combined with that of DMI.  The

Defendants, however, submitted no consolidated financial statements to support this assertion.

Mr. O'Connor, an accountant who provided services to the Debtor, DMI and the Jenoskis, testified as to the relationship between DMI and the Debtor. He stated that they were very distinct entities, stating "[e]ssentially Duplication Management was the production facility that provided goods for sale to DMI, Inc. and Duplication Management's only customer was DMI, Inc. . . ." He noted that the sales force was employed by DMI and that DMI would provide orders for the Debtor. He also observed that "historically what we did is, we would bill - - we would charge DMI, Inc. sufficient sales - - we would bill them for the amount to cover all the operating costs plus make a profit, and there was a real distinct reason to do that . . ." Thus, the Debtor paid rent for the office and production space it shared with DMI.

The Debtor's accountant further testified that to assess the financial condition of the Debtor the companies would have to be combined, adding "in fact, we combined both of the companies together for financial statement purposes from inception." He testified as follows:

> Q: Mr. O'Connor, at various times during the examination Mr. Bean asked you about specific documents that related to Duplication Management; is that correct?
> A: Yes.
> Q: And for example, he showed you, I believe, balance sheets for 2006, 2007 and 2008 that related solely to Duplication Management, isn't that right?
> A: Yes.
> Q: And when asked about those particular documents, you testified that based on those documents the assets—the liabilities of Duplication Management exceeded its assets; is that right?

11

> A: Yes.
> Q: In 2006, 2007 and 2008, were you looking at solely the assets and liabilities of Duplication Management?
> A: No.
> Q: In order to assess the financial condition of Duplication Management in the sense of its assets and liabilities, what else would you need to look at to make a determination of whether or not Duplication Management was insolvent?
> A: You would have to combine both companies together, and in fact, we combined both of the companies together for the financial statement purposes from inception.

Mr. O'Connor, however, prepared separate tax returns for each corporation.  As noted above, the Defendants did not submit either a balance sheet for DMI or any combined balance sheets, cash flow statements or income statements. In addition, they did not submit any evidence as to the assets and liabilities of DMI which would permit this Court to find that the Debtor was solvent even if DMI's assets and liabilities were combined with the Debtor's assets and liabilities.  The Defendants submitted no evidence whatsoever as to the financial health of DMI.  DMI continued its operations until after the involuntary petition was filed against the Debtor.

The following table contains a summary of the Debtor's balance sheet.

| Year | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Current Assets | $ 431,191.49 | $ 325,675.48 | $ 312,656.26 | $ 308,319.85 | $ 45,365.02 |
| Total Assets | 1,389,593.93 | 1,161,088.52 | 1,040,422.42 | 887,730.94 | 134,448.27 |
| Current Liabilities | 1,496,050.93 | 1,362753.77 | 1,255,692.70 | 2,082,158.64 | 2,299,098.69 |
| Long Term Liabilities | 884,268.78 | 748.425.20 | 606,956.98 | 14,438.17 | 423,950.20 |

| Total Liabilities | 2,380,319.71 | 2,111,178.97 | 1,862,648.98 | 2,096,598.71 | 2,723,046.69 |
|---|---|---|---|---|---|

As noted above, the Debtor was a printing company. It did not have its own sales force. Its affiliate, DMI, was the sales company that generated the printing work performed by the Debtor. Mr. Jenoski was a salesman for DMI. While DMI had approximately ten employees who generated sales for the Debtor, Mr. Jenoski alone generated approximately 30%-40% of all sales. He also managed the day-to-day operations of DMI, and performed the duties of sales manager. He also ran, with the assistance of a general manager and supervisors, the day-to-day operations of the Debtor and supervised over 50 employees until the Debtor's financial fortunes declined and the workforce shrunk to approximately 30 employees.

The Debtor had a general manager named Carl Beatrice. According to Mr. Jenoski, Mr. Beatrice "managed the production of all of [the Debtor's] work," including scheduling personnel and managing people. The Debtor also employed multiple shift managers. DMI paid Mr. Jenoski approximately $80,000 each year from 2006 through 2010. DMI, like the Debtor, also distributed profits to him on account of his status as the sole shareholder of Chapter "S" corporations.

The Debtor paid the amount due BANA for March 2010 on the eve of the day the Debtor ceased operating. The Debtor ceased operations before March began; accordingly, Mr. Jenoski would not have been providing, and did not provide, further services to the Debtor after it ceased operations.

13

The Debtor did not issue Mr. Jenoski an IRS form W-2 or a form 1099 in any year.
As noted, DMI paid Jenoski approximately $80,000 per year, and Mr. Jenoskis reported that
amount on the couple's joint federal income tax returns on line 7, "Wages, tips, etc."  Mr.
Jenoski received, as compensation for his services to the Debtor, payment of the employer's
portion of his health and dental insurance premiums, and payment of his life insurance
premium. The Debtor also distributed profits to him on account of his status as the sole
shareholder of a Chapter "S" corporation.

The Debtor treated the payments it made to Countrywide and BAC/BANA with
respect to the Loan differently for federal income tax purposes in different years.  In 2005,
the Debtor treated the payments it made to Countrywide on account of the Loan as part
of the company's distribution of profits to Mr. Jenoski.

Mr. Jenoski testified that in 2006, he made a substantial "loan" to the Debtor. The
Debtor treated the payments to Countrywide as a partial repayment of that "loan," even
though (i) Mr. Jenoski did not know whether he had made a loan to, or a capital
contribution to the Debtor; (ii) the Debtor did not execute a promissory note or any other
documents evidencing the "loan" or equity investment; (iii) Mr. Jenoski was not entitled
to interest on the "loan;" (iv)  Mr. Jenoski did not know whether the loan or equity
investment had a maturity date; (v) Mr. Jenoski did not recall whether the Board of
Directors of the Debtor met to approve the loan or equity investment; (vi) the proceeds of
the loan were used to pay off a debt to Xerox Corporation rather than for ongoing
operations or capital expenditures; (vii) the Debtor had a negative amount in its capital

14

account at the time of the "loan;" and (viii) other than this "loan," Mr. Jenoski never made

an equity contribution to the Debtor after 2006.  Mr. O'Connor recognized that the "loan"

was a capital investment by Mr. Jenoski who "pretty much hocked everything to keep the

company going" at that time.

As noted above, in 2005 and 2006, Mr. Jenoski received income as distributions from

the Debtor and DMI in addition to his annual salary of approximately $80,000 from DMI.

In 2006, as noted above, the distributions included repayment of an undocumented "loan"

made by Mr. Jenoski to the Debtor.  In 2007 and 2008, Mr. Jenoski received bonuses from

the Debtor and DMI.  Schedule E to the Jenoskis' individual tax returns reveals the

following for the years in which distributions were reported (losses were reported in 2009

and 2010.

| Year | 2005 Distrib. | 2006 Distrib. | 2007 Distrib. | 2007 Bonus | 2008 Distrib. | 2008 Bonus | 2009 | 2010 |
|------|------|------|------|------|------|------|------|------|
| DUP | $ 66,693.00 | $370,531.00 | $ 62,252.00 | $174,148 | $156,366.00 | $ 43,682 | | |
| DMI | 827,875.00 | 188,350.00 | 83,610.00 | 132,309 | 66,707.00 | 169,500 | | |
| Mtg. Pay.[5] | 69,762.52 | 84,946.99 | 106,200.55 | | 86,160.68 | | $117,389.07 | $21,031.06 |

In addition to the above, the parties agreed that the Debtor made a payment to

Countrywide in the amount of $5,576.67 on December 10, 2004 which was credited to the

Jenoskis' indebtedness on December 14, 2004.  The Debtor made payments totaling

---

[5] The Mortgage payments are from the chart prepared by the Defendants and
attached as an exhibit to the Affidavit of the Trustee's counsel.

15

$34,982.42 prior to July of 2006 and the commencement of the look back period under Mass.

Gen. Laws ch. 109A, § 6.  Between January and May of 2009, the Debtor made checks

payable to Countrywide Home Loans, Inc. in the total amount of $43,714.88.  For the

remainder of 2009, the Debtor made payments to BAC in the total amount of $73,674.19.

All payments made in 2010 were made to BAC.

As noted above, in 2007 and 2008, the Debtor treated a portion of what would have

been distributions made to him on account of his status as the shareholder of an "S"

Corporation as an "officer bonus" because New Hampshire, the state in which Mr. Jenoski

resided and continues to reside, taxes dividends, as well as distributions from S

Corporations, but not earned income.[6]  Mr. O'Connor testified about how the amount of

the "bonus" was determined:

> His bookkeeper would charge the revenues - - or the distributions to Bank of
> America, or whatever else [he] might pay personally, to miscellaneous
> expense, and I, at the end of the year end doing the tax return, would
> reclassify it to officer bonus.

> ***

> It was whatever was paid to him for personal expenses or a check that was
> paid to Bank of America for his mortgage on the property up in New
> Hampshire.

Mr. O'Connor also testified at his deposition that he never thought of the officer

bonus as tied to the value of Mr. Jenoski's services to the Debtor, particularly where the

---

[6] In 2007, the Jenoskis reported distributions from the Debtor and DMI totaling
$145,862 on line 17. In 2008, they reported total distributions of $257,695; in 2009 and
2010, they reported losses.

16

goal was to recast the distributions, representing S Corporation profits which were taxable in New Hampshire where Mr. Jenoski lived, as officer bonuses which would not be taxable as earned income in that state. In addition, the amount on the Debtor's tax returns for the officer bonus bore no relationship to the amount the Debtor paid each year on the mortgage. In 2007, the officer bonus from the Debtor was $174,148 while the Debtor paid approximately $106,000 to Countrywide; in 2008, the officer bonus from the Debtor was $42,682 while the Debtor paid approximately $86,000 to Countrywide.

In 2009, after audit adjustments by the IRS, the Debtor did not treat any of the distributions to Mr. Jenoski as an "officer bonus" even though the Debtor made approximately $117,000 in mortgage payments. Indeed, in 2009, the Jenoskis reported a loss on Schedule E of their federal tax return with respect to the S corporations in the amount of -$467,448, reporting that loss on line 17 of their Form 1040.

According to Mr. O'Connor, payments to Countrywide and BAC/BANA were "distribution of profits for a shareholder" that "depleted the assets of the [Debtor]." Mr. O'Connor acknowledged that the Debtor made the Mortgage payments because Mr. Jenoski, could not afford to make them.

Mr. Jenoski admitted during his deposition in this proceeding that he had testified at one point during his Rule 2004 Examination that payments on the Loan were not compensation for his services to the Debtor. Mr. O'Connor, the accountant upon whom Mr. Jenoski relied for tax advice, testified that Mr. Jenoski did not receive compensation from the Debtor, and that he was unaware of any documents that would suggest that the

17

Debtor paid Countrywide as part of, or in lieu of, Mr. Jenoski's compensation for services rendered to the Debtor.  Although Mr. Jenoski subsequently asserted the Mortgage payments were compensation, he admitted that he never made a determination as to the value of his services to the Debtor, stating "[n]ot in my head, no."  Specifically, Mr. Jenoski testified at one point during his deposition that the payments the Debtor made to Countrywide and BAC/BANA were made in lieu of payments for his services to the Debtor.  He indicated that they were part of his compensation, and were included in the amount he received as distributions from the Debtor reported on line 17 of the 1040 joint tax return he filed with his spouse.  He stated:  "I feel I paid for them [the mortgage payments], but the check was written from Duplication Management," agreeing with the observation that he "kind of cut out the middleman" by having the Debtor pay Countrywide and BAC/BANA directly.  At another point in his deposition, he testified that he did not remember what the rationale was for having the Debtor pay the Mortgage.  In addition, he testified that he did not know how the officer bonus was calculated.

The Court discredits Mr. Jenoski's testimony that the Debtor's payment of his vacation home Mortgage was part of his compensation because of his conflicting statements.  Moreover, Mr. O'Connor accounted for the Mortgage payments as part of the distributions of profits from the Debtor and then, for tax purposes, reclassified a portion of the payments as a bonus to Mr. Jenoski. The amount of the Mortgage payments, unlike a salary or form of regular compensation, varied from month to month. In addition, the amount of the payments were optional and Mr. Jenoski took advantage of the repayment

18

options available to him when causing the Debtor to issue checks.  The amount of the

Mortgage payments were not tied to his performance.  Indeed, the amount of the Mortgage

payments increased as the Debtor's financial condition deteriorated in 2009.  Most telling,

DMI made the Mortgage payments when the Debtor ceased operations.

The Defendants' deposition witness, nevertheless, testified as follows:

Q. Is it the banks' position that Mr. Jenoski provided - - what is the banks'
position? Let me ask you What is the banks' position with respect to any
relationship between the services Mr. Jenoski provided to the debtor and the
payments made by the debtor to the banks on the loan made to Mr. and Mrs.
Jenoski?

A. Based upon the testimony of Mr. Jenoski and Mr. O'Connor, the bank
takes the position that the payments made on behalf of Mr. Jenoski were in
lieu of salary, they were his employment compensation upon which he paid
taxes.

## III. POSITIONS OF THE PARTIES

A. The Plaintiff

The Plaintiff maintains that she may avoid fraudulent transfers made two years

before the commencement of the case under 11 U.S.C. § 548(a)(1)(B), as well as fraudulent

transfers made four years before the commencement of the case under applicable

non-bankruptcy law, namely the Massachusetts Uniform Fraudulent Transfer Act, Mass.

Gen. Laws c. 109A ("MUFTA").  *See* 11 U.S.C. § 544(b).  Because she is able to satisfy the

requirements for avoidance under both § 548(a)(1)(B) and § 544(b)(1), she asserts that she

may recover the amounts the Debtor paid to and for the benefit of the Defendants pursuant

to 11 U.S.C. § 550(a)(1). The Trustee recognizes that she is required to prove, by a

preponderance of the evidence, four elements: (1) a transfer of the debtor's property; (2)

19

made within two/four years of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) the debtor was insolvent when the transfer was made. Under § 544(b), the Trustee must also prove that there is at least one unsecured creditor who could avoid the transfers under MUFTA, noting the presence of at least three: Xerox Corporation, xpedx, and the 215 Salem Street Trust.

The Trustee asserts that the parties have stipulated to payments made by the Debtor.[7]  Turning to reasonably equivalent value under § 548(a)(1)(B) and its counterpart under Mass. Gen. Laws ch. 109A, § 6, the Trustee points out that determination of reasonably equivalent value is a two-step process that involves consideration of direct and indirect benefits.  She maintains that the Debtor received no "direct" benefit each month in exchange for making the Mortgage payment to the Defendants because the Debtor was not a co-maker or guarantor on the Note with respect to the Loan, and had no obligation to repay it and the Defendants have admitted that they did not provide anything of value to the Debtor, directly or indirectly, in exchange for the monthly Mortgage payments.

---

[7]  She states that the parties have stipulated that the Debtor made a total of $287,040.50 in more than thirty separate monthly payments from its "accounts payable" account to Countrywide during the four-year prepetition period, and $85,205.73 in eleven payments during the portion of the two-year period prepetition from July 2008 through May 2009.  She adds that they have stipulated that the Debtor made a total of $105,221.18 in ten monthly payments from its "accounts payable" account to BAC, for the benefit of the holder of the Note, BANA, during the portion of the two-year period from June 2009 through March 2010. She concludes that "[a]s such, there is no dispute that the Debtor transferred its property to Countrywide and to BAC and for the benefit of BANA during the four-year period prepetition, and to BAC and for the benefit of BANA during the two-year period prepetition.

The Trustee contends that the burden of production shifted to the Defendants to establish that the Debtor received reasonably equivalent value indirectly as a result of the transfer in light of the evidence she presented that the Debtor was not liable on the Note and Mortgage. She maintains that the Defendants were required to demonstrate that any indirect benefit was "concrete" and to quantify the value of the benefit received by the Debtor so that the Court can determine whether the Debtor received value reasonably equivalent to the value it gave. She adds that even if the Defendants could show that the Debtor made each monthly Mortgage payment in lieu of other compensation for Mr. Jenoski's services, and even if they could show that Mr. Jenoski's services were "concrete," the Defendants cannot satisfy their burden of quantifying the value the Debtor received from those services. She maintains they cannot satisfy that burden because they admitted they could not quantify the value of Mr. Jenoski's services to the Debtor for any month between December of 2004 and March of 2010; that they were unaware of any relationship between the value of Mr. Jenoski's services to the Debtor and the amount of the monthly Mortgage Payments the Debtor made to them; that while the amount of the monthly payments made by the Debtor to the Banks could vary by as much as approximately $5,800 they did not know whether the value of Mr. Jenoski's services to the Debtor changed over time; and that they did not know whether the value of Mr. Jenoski's services to the Debtor was in an amount equal to, or less than, the amount of the payments they received from the Debtor each month.

Referencing the definition of insolvency in 11 U.S.C. 101(32)(A) and the Debtor's

balance sheets, the Trustee also maintains that the evidence unequivocally shows that the Debtor was insolvent during the four year period prior to the bankruptcy case. She urges the Court to reject the Defendants' contention, based upon the deposition testimony of Mr. O'Connor that the assets and liabilities of the Debtor and non-debtor DMI should be combined for purposes of evaluating the Debtor's solvency in this proceeding and if they were combined, the Debtor and DMI were not insolvent during the early portion of the two-year prepetition period. She maintains that disregarding corporate separateness between the Debtor and DMI is disfavored under Massachusetts law, adding that there is no factual basis for doing so here.

Finally, with respect to her fraudulent conveyance counts, the Trustee asserts that she may recover the Mortgage payments made by the Debtor pursuant to 11 U.S.C. § 550(a)(1) from the initial transferees, Countrywide and BAC, plus prejudgment interest, citing Lassman v. Keefe (In re Keefe), 401 B.R. 520, 526-27 (B.A.P. 1st Cir. 2009).

The Trustee also maintains that she is entitled to judgment on her claims for money had and received and unjust enrichment. Citing, *inter alia*, Fort Point Commercial Co, Inc. v. Spiegel, 28 Mass. L. Rptr. 339, 2011 WL 1758950 at *9 (Mass. Superior Ct. April 8, 2011), she maintains that she has satisfied the following requisite elements for unjust enrichment: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. Noting that the Debtor was

22

neither a co-maker nor guarantor and thus had no obligation to repay the Loan, the Trustee

maintains that she is entitled to the remedy of restitution, quoting Santagate v. Tower, 64

Mass. App. Ct. 324, 336  (2005), for the proposition that "[r]estitution rectifies unjust

enrichment by forcing restitution to the plaintiff."

In her Reply to the Defendants' Opposition, the Trustee asserts that the "facts"

purportedly adduced by the Defendants fail to create genuine issues of material fact.  With

respect to the Debtor's solvency, the Trustee contends that upon the submission of the

Debtor's balance sheets, the burden shifted to the Defendants to support their theory that

this Court should disregard the separateness of the Debtor and DMI.   According to the

Trustee, the Defendants submitted no competent evidence to support either substantive

consolidation or  veil piercing, and, thus, they failed in their burden of production.  She

states that the accountant's testimony as to consolidation based upon common ownership

is woefully insufficient to create a genuine issue of material fact because Mr. O'Connor

testified as a lay person, not an expert, and his testimony was, therefore, inadmissible

under Fed. R. Evid. 701; that his opinion was inadmissible under Fed. R. Evid. 702 because

he was not designated as an expert; that he was rendering a legal opinion;  and finally that

his deposition testimony was not probative, particularly where common ownership of two

entities is not even one of the factors mentioned in Rodrigues v. Osorno (In re Osorno), 478

B.R. 523, 536-37 (Bankr. D. Mass. 2012).

With respect to whether the Mortgage payments made by the Debtor were in lieu

of compensation to Mr. Jenoski, the Trustee states:

> [W]hile there is a dispute as to whether the Mortgage Payments were made
> in lieu of additional compensation to Jenoski, there is no "genuine issue"
> with respect to that dispute because no reasonable jury, even drawing
> favorable inferences, could conclude that they were. Second, even if there
> were a genuine issue as to whether the payments were made in lieu of
> additional compensation, because the Banks admit they provided no
> compensation to the Debtor "in exchange for" the Mortgage Payments, they
> bear the burden of producing evidence to quantify the value of Jenoski's
> services; they admittedly cannot do so.  Accordingly, any dispute as to
> whether the payments were made in lieu of additional compensation is not
> "material" under the governing law.

The Trustee points to evidence that the Mortgage payments were not compensation, including the absence of IRS form W-2 issued by the Debtor to Mr. Jenoski in any tax year and Mr. Jenoski's payment of social security or Medicare taxes for any income received from the Debtor.[8] In addition, Mr. O'Connor testified unequivocally that Mr. Jenoski did not receive compensation from the Debtor.  If the amount of the Mortgage payments were for services rendered to the Debtor, the amount of the Mortgage Payments should have remained consistent over time. Yet, the amount of the Mortgage payments varied significantly from year to year.[9]  Finally, the Debtor made the Mortgage payment due March 1, 2010 on February 25, 2010, even though Mr. Jenoski and the Debtor knew the Debtor would be ceasing operations the next day, and thus Mr. Jenoski would be providing

---

[8] She adds that Mr. Jenoski avoided paying social security and Medicare taxes by treating them on his federal income tax returns, in every year but 2006, as distributions to the shareholder of an "S" corporation and/or as an "officer bonus," a bonus that bore no relationship to the value of his services to the Debtor. In 2006, it treated the Mortgage Payments as repayment of a "loan" made by Jenoski. The payments, at least in that year, could not be both "additional compensation" and repayment of a "loan."

[9] For example, the amount of the Mortgage payment made by the Debtor increased from $5,645.94 in February 2009, to $10,516.03 in March 2009.

no services to the Debtor in March, 2010.

The Trustee, citing Braunstein v. Walsh (In re Rowanoak Corp.), 344 F.3d 126 (1st Cir. 2003), emphasizes that the Defendants had the burden of producing evidence to quantify the value of Mr. Jenoski's services to the Debtor to establish "reasonably equivalent value." She points to the Defendants' admission that they provided no value to the Debtor "in exchange for" the Mortgage payments, thereby satisfying her prima facie case. She adds that even if Rowanoak is inapposite, the "indirect benefit rule" requires the Defendants to quantify the value received by the Debtor for Mr. Jenoski's services. Noting federal law applicable to § 548 and the national scope of the Uniform Fraudulent Transfer Act, the Trustee cites Rowanoak in which the First Circuit stated the following:

> The Trustee undisputably has the burden of proving the transfers were fraudulent, and this burden never shifts to Walsh. But the district court seemed to equate the burden of proof with the burden of production.

> > The burden of the issue and the duty of going forward with evidence are two very different things. The former remains on the party affirming a fact in support of his case, and does not change at any time throughout the trial. The latter may shift from side to side as the case progresses, according to the nature and strength of the proofs offered in support or denial of the main fact to be established.

> 9 Wigmore, Evidence § 2487 (Chadbourn rev.1981); *see e.g.*, In re Minnesota Utility Contracting, Inc., 110 B.R. 414, 418-19 (D. Minn.1990) (discussing the difference between shifting the burden of proof and shifting the burden of production in response to a prima facie case); In re Uhlmeyer, 67 B.R. 977, 980 (Bankr. D. Ariz. 1986) ("The trustee has the burden of proof to establish the conveyance was made under conditions that bring it within [11 U.S.C.] § 548 [fraudulent transfers], although the burden of going forward with the evidence may shift if the trustee establishes a prima facie case."). . . . If Walsh believed the bank statements would assist her in convincing the bankruptcy

court that she loaned Rowanoak certain funds, nothing prevented her from
introducing the statements. By choosing not to produce such evidence, Walsh
took the risk the bankruptcy court would find against her.

Rowanoak, 344 F.3d at 131-32.

The Trustee also discounts the Defendants' contention that genuine issues of
material fact exist as to knowledge that the Debtor made the Mortgage payments. She
notes the absence of any requirement of, or citation to authority for, the proposition that
there be knowledge that the Debtor, not the Jenoskis, was making the Mortgage payments.
Thus, any dispute about whether the Defendants had notice that the Debtor was making
the payment, in her view, is not material. The Trustee adds, however, that Ms. Slyapich
admitted that the face of the checks which were written on the "Accounts Payable" account
of the Debtor could have been viewed by Countrywide of BAC personnel, adding that, in
any event, they had constructive notice of the payor. Finally, the Trustee contends that she
is  entitled to six years of prejudgment interest under her count for money had and
received and unjust enrichment because the "gist of the action" is contractual.

B. The Defendants

The Defendants complain that the Trustee employs "a legal sleight of hand on her
claims for fraudulent conveyance by asserting that it is the Bank's [sic] burden (without any
support in Massachusetts law) to provide evidence quantifying the value of any 'indirect'
benefits Debtor may have received in exchange for paying [the Jenoskis'] Mortgage." They
maintain that this burden has not been adopted in Massachusetts and should be rejected.
They add that the Trustee wrongly states it is their burden to provide evidence that the

26

Debtor was not insolvent during the four years prepetition. They maintain, to the contrary, that to prevail on her claim for fraudulent conveyance, the Trustee has the burden of proving that the Debtor (1) received no reasonably equivalent value for the conveyances; and (2) was insolvent four years prepetition, adding that the Trustee's own statement of the facts shows these two points are plainly disputed by the parties.  Specifically, the Defendants note Mr. Jenoski's inconsistent testimony on whether the Mortgage payments were in lieu of compensation for services, and Mr. O'Connor's testimony that the financial statements of the Debtor and DMI should be consolidated because both companies were owned by the same individual, calling into question whether or not the Debtor was insolvent four years prepetition. With respect to the insolvency issue, the Defendants rely upon Mr. O'Connor's testimony that you would have to combine both companies to assess the financial condition of the Debtor.  They contend that these issues are not appropriately determined in the context of a motion for summary judgment and should be determined after a trial.

With respect to the issue of whether or not the value of services rendered by Mr. Jenoski to the Debtor were less than reasonably equivalent in value to the Mortgage payments made by Debtor on the Jenoskis' behalf, the Defendants maintain that no court in Massachusetts has adopted the rule set forth in In re Jolly, Inc., 188 B.R. 832, 843 (Bankr. D. Minn. 1995)("[O]nce it has been proven that all of the consideration for a debtor's transfer of assets went directly to a third party, the defendant seeking the shelter of the "indirect benefit" defense bears the "intermediate" burden of production as to the

concreteness of the indirect benefit, and its reasonable equivalence in value.").  Citing the deposition testimony of Ms. Slyapich, an employee of BANA designated to testify for the Defendants, they maintain that the sum of the Mortgage payments represents that value because the "[mortgage] payments were in lieu of salary [and were] his employment compensation upon which he paid taxes." Specifically, they point to Ms. Slyapich's deposition testimony although it was based on that of Mr. Jenoski who stated that the Mortgage payments were for services he rendered the Debtor.  The Defendants contend that there are factual issues for trial as to whether the Mortgage payments were in lieu of salary and whether the payments were reasonably equivalent in value to the service of Mr. Jenoski as the Debtor's president.

The Defendants also argue that the Trustee is not entitled to summary judgment on Counts I and II for unjust enrichment and money had and received, respectively.  Relying upon the testimony of Ms. Slyapich that there were no procedures in place to determine whether the Mortgage payments on the Loan were made by the borrower [the Jenoskis] or a third party [the Debtor], the Defendants argue that "there is no evidence that Countrywide *knew* that the benefit of the payments came from the Debtor, or even had actual knowledge that the debtor was making the payments on behalf of the Jenoskis." They conclude that there is a genuine issue of material fact as to the Defendants' knowledge of who made the payments, as well as Countrywide's knowledge that the benefit of the transfers came from the Debtor, particularly where under the Loan documents there was no requirement that the borrowers actually make the payments. The

28

Defendants also assert there is a genuine issue of fact concerning whether Countrywide

knew that payments were actually coming from the Debtor and not the Jenoskis because

of the use of an automated system to process checks.  Based upon Ms. Slyapich's deposition

testimony, the Defendants assert that neither Countrywide nor BANA had knowledge that

the checks it received were from the Debtor, arguing that the Trustee is not entitled to six

years of recoupment for unjust enrichment in any event because the applicable statute of

limitations is three years, not six.  They further argue that the claim is a tort claim because

of the lack of any contractual relationship between the Debtor and the Defendants.

## IV. DISCUSSION

A. <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if it establishes that there are no material

facts in dispute and it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a),

made applicable to this proceeding by Fed. R. Bankr. P. 7056.[10]  In <u>Desmond v. Varrasso (In</u>

<u>re Varrasso</u>), 37 F.3d 760 (1st Cir.1994), the United States Court of Appeals for the First

Circuit articulated the standard for allowance of motions for summary judgment, stating:

> It is apodictic that summary judgment should be bestowed only when no
> genuine issue of material fact exists and the movant has successfully
> demonstrated an entitlement to judgment as a matter of law. . . .  As to issues
> on which the movant, at trial, would be obliged to carry the burden of proof,
> he initially must proffer materials of evidentiary or quasi-evidentiary

---

[10] Fed. R. Civ. P. 56 was amended effective December 1, 2010. The summary
judgment standard now appears in subsection (a) of Rule 56, rather than at subsection (c).
The amended rule, however, does not change the standard for summary judgment. *See*
<u>Farmers Ins. Exch. v. RNK, Inc.</u>, 632 F.3d 777, 782 n. 4 (1st Cir. 2011)<u>.</u>

quality—say, affidavits or depositions—that support his position. *See* Lopez
v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir. 1991);
Bias v. Advantage Int'l, Inc., 905 F.2d 1558, 1560–61 (D.C. Cir.), *cert. denied*,
498 U.S. 958, 111 S.Ct. 387, 112 L.Ed.2d 397 (1990); *cf.* Mendez v. Banco
Popular de Puerto Rico, 900 F.2d 4, 7 (1st Cir. 1990) ("The mere fact that
plaintiff failed to file a timely opposition does not mean that defendant's
Rule 56 motion should be granted"). When the summary judgment record
is complete, all reasonable inferences from the facts must be drawn in the
manner most favorable to the nonmovant. *See, e.g.*, Morris v. Government
Dev. Bank, 27 F.3d 746, 748 (1st Cir.1994); Garside [ v. Osco Drug, Inc.], 895
F.2d [46] at 48 [ (1st Cir.1990) ]; Greenburg v. Puerto Rico Maritime Shipping
Auth., 835 F.2d 932, 934 (1st Cir.1987). This means, of course, that summary
judgment is inappropriate if inferences are necessary for the judgment and
those inferences are not mandated by the record. *See* Blanchard v. Peerless
Ins. Co., 958 F.2d 483, 488 (1st Cir.1992) (warning that summary judgment is
precluded "unless no reasonable trier of fact could draw any other inference
from the 'totality of the circumstances' revealed by the undisputed
evidence").

37 F.3d at 763 (footnote omitted).

B. Fraudulent Conveyance Claims

As noted above, two issues are determinative with respect to the Trustee's
fraudulent conveyance claims: 1) whether the Debtor was insolvent at the time of the
transfers to the Defendants; and 2) whether the Debtor received any indirect benefit from
the transfers in the form of Mr. Jenoski's services to the Debtor which can be quantified to
determine whether the Debtor received reasonably equivalent value for the transfers.

A. Statutory Provisions

Section 548 of the Bankruptcy Code provides in relevant part:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the
benefit of an insider under an employment contract) of an interest of the
debtor in property, or any obligation (including any obligation to or for the
benefit of an insider under an employment contract) incurred by the debtor,
that was made or incurred on or within 2 years before the date of the filing

of the petition, if the debtor voluntarily or involuntarily — . . .

    (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

    (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

    (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

    (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

* * *

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

* * *

(d)(2) In this section —

    (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor.

11 U.S.C. § 548.

31

Pursuant to 11 U.S.C. § 544(b)(1)[11] and Massachusetts law, the Trustee may avoid as fraudulent a transfer made when the debtor is insolvent.  Specifically, Mass. Gen. Laws ch. 109A, § 5, which the Trustee paraphrases in her Amended Complaint, provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Mass. Gen. Laws ch. 109A, § 5.  In addition, the Trustee references § 6 which provides in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation

---

[11] Section 544 provides in pertinent part:

Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Mass. Gen. Laws ch. 109A, § 6.  It is undisputed that at all times from June 2006 to the petition date, Xerox Corporation, 215 Salem Street Trust, and xpedx were creditors of the Debtor.

 "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  Id. at § 3(a).  "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."  Id. at § 4(a).

As the court noted in Tomsic v. Pitocchelli (In re Tri-Star Techs. Co., Inc.), 260 B.R. 319 (Bankr. D. Mass. 2001),

In many respects, the Massachusetts UFTA § 6(a) mirrors Bankruptcy Code § 548(a)(1)(B). Campana v. Pilavis (In re Pilavis), 233 B.R. 1, 10 (Bankr. D. Mass. 1999); Leibowitz v. Parkway Bank & Trust Co. ( In re Image Worldwide Ltd.), 139 F.3d 574, 577 (7th Cir.1998). However, critical differences exist. For avoidance of the challenged payments pursuant to UFTA § 6(a), the Trustee's derivative standing under § 544(b) is dependent on the existence of at least one actual unsecured creditor who could have avoided the challenged transfers. Section 548(a)(1)(B) does not require the existence of such a creditor. Furthermore, avoidance actions under § 6(a) of UFTA must be brought within four (4) years from the date of the transfers. Carpenter v. Granderson (In re Granderson), 214 B.R. 671, 672 (Bankr. D.

33

> Mass.1997); Mass. Gen. Laws Ann. ch. 109A, § 10. Section 548(a)(1)(B), on the
> other hand, reaches back only to those transfers made within one year [now
> two years] of case commencement.

Tri-Star Techs. Co., Inc., 260 B.R. at 324. As noted above, there is no dispute as to the

existence of unsecured creditors who could have avoided the transfers.

Section 550 of the Bankruptcy Code provides the remedies for recovery of avoided

transfers.  The Court may order the return of  the property transferred, or if the court so

orders, the payment of the value of such property, from the initial transferee.  See 11 U.S.C.

§ 550(a)(1).

1. Insolvency

The Court finds that the Trustee sustained her burden on the issue of the Debtor's

insolvency.  The Defendants relied exclusively on the statement of Mr. O'Connor in which

he stated that "[y]ou would have to combine both companies together, and in fact, we

combined both of the companies together for financial statement purposes from inception."

That statement alone in no way rebutted the Trustee's prima facie case.  The Trustee

submitted balance sheets for the Debtor which established its insolvency.  The undisputed

facts reveal that DMI continued in existence until August of 2012, approximately two years

after the involuntary petition filed against the Debtor.  Although the Debtor and DMI

shared office space and the Debtor provided benefits for the employees of DMI, the

Defendants failed in their burden of production to establish that the two entities should be

consolidated either as alter egos of Mr. Jenoski or because their corporate existence was a

sham. See  My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619-20 (1968).

More importantly, assuming the two corporations were merged, the Defendants failed to submit any consolidated balance sheets that would show that the value of assets of DMI and the Debtor, when combined, exceeded their combined liabilities.

2. Reasonably Equivalent Value and Indirect Benefits

In Smith v. Am. Founders Fin. Corp., 365 B.R. 647 (S.D. Tex. 2007), the court identified three factual scenarios in which a debtor's discharge of a debt of another may be considered a transfer for reasonably equivalent value. Citing In re Newtowne, Inc., 157 B.R. 374, 379 (Bankr. S.D. Ohio 1993), it observed:

> The first is when the debtor's payment of a third party's debt results in a discharge of the debtor's own debt to the third party. Id. But if no corresponding obligation of the transferor is discharged, courts have not hesitated to avoid transfers made to satisfy a third party's debt. See, e.g., In re Bargfrede, 117 F.3d at 1079–80 (holding that the debtor's transfer to a church to pay the debt of his embezzling wife was avoidable). The second scenario is when the debtor and the third party are so "related or situated that they share an identity of interests because what benefits one will . . . benefit the other to some degree." In re Newtowne, Inc., 157 B.R. at 379 (quoting In re Pembroke Dev. Corp., 124 B.R. at 400). Finally, when a debtor "enjoys the benefits of the goods or services it bought for its principal, the transfer of money for those goods or services may not be avoided." Id.

Smith v. Am. Founders Fin. Corp., 356 B.R. at 667. The Defendants invoke the last scenario in opposing the Trustee's Motion for Summary Judgment on Counts III through VI.

In Rosen v. Moreno (In re Rood), No. 08-17199PM, 2011 WL 1742016 (Bankr. D. Md. Feb. 12, 2011), a case analogous to the instant case, the court considered whether indirect benefits constituted reasonably equivalent value in the context of a motion for summary judgment filed by residential landlords who had received rental payments from debtor entities, who were not liable on the lease, for residential property used by the individual

debtor, Rood.  The court observed that the landlord's motion for summary judgment was

premised on the arguments that Rood used the bank accounts of certain affiliated debtor

entities interchangeably and commingled all their financial dealings, that the entities were

nothing more than his alter egos, such that Rood's personal debts became the debts of the

debtor entities.  2011 WL 1742016 at *2.  The bankruptcy court disagreed and also rejected

the landlords's assertion that section 548(c) provided them with a defense to the Trustee's

fraudulent conveyance claim because the paying entities received "equivalent value" for

their payment of Rood's rental of the residence. The court in <u>Rood</u>, observed that not a

single expert or fact witness for the landlords attempted to quantify the value of the

indirect benefits they claim were received by the affiliated entities, stating that "the

purported benefits, even if legally cognizable, and whether considered individually or as

a whole, have value (if any) that falls well short of "reasonably equivalent" value." <u>Rood</u>,

2011 WL 1742016 at * 5.

 In its decision, the <u>Rood</u> court relied on <u>Cooper v. Centar Inv. (Asia) Ltd, CQS</u>

<u>Convertible & Qualitative Strategies Master Fund (In re Trigem America Corp.)</u>, 431 B.R.

855 (Bankr. C.D. Cal. 2010), in which the court stated:

> Indirect benefits can suffice as reasonably equivalent value *if* they are "fairly
> concrete and identifiable." <u>Official Comm. of Unsecured Creditors of TOUSA</u>
> <u>v. Citicorp N. Am (In re TOUSA, Inc.)</u>, 422 B.R. 783, 846–50 (Bankr. S.D. Fla.
> 2009) [subsidiaries who conveyed liens for borrowed funds used for debts for
> which they were not liable received little or no benefit in merely forestalling
> the parent's bankruptcy]; <u>Greenspan v. Orrick, Herrington & Sutcliffe LLP</u>
> <u>et al. (In re Brobeck, Phleger & Harrison, LLP)</u>, 408 B.R. 318, 341 (Bankr. N.D.
> Cal. 2009) [insolvent law firm's waiver of profits in unfinished business in
> favor of individual partners did not result in sufficient indirect benefit]. Once
> the plaintiff makes a prima facie showing that no sufficient direct benefit was

36

> received in the transaction, it is the defendants' burden to prove sufficient
> indirect benefit that is tangible and concrete. In re Brobeck, 408 B.R. at 340;
> In re TOUSA, 422 B.R. at 844, citing Pummill v. Greensfelder, Hemker & Gale
> (In re Richards & Conover Steel Co.), 267 B.R. 602, 614 (8th Cir.BAP2001); *see
> also* Clark v. Security Pac. Business Credit, Inc. ( In re Wes Dor, Inc.), 996 F.2d
> 237, 243 (10th Cir. 1993); Leonard v. Mountainwest Fin. Corp. ( In re Whaley),
> 229 B.R. 767, 775 (Bankr. D. Minn.1999). Moreover, the issue of "reasonably
> equivalent value" is determined from the perspective of the transferor's
> creditors and the court must analyze all the circumstances surrounding the
> transfer. In re Brobeck, 408 B.R. at 341–42.

In re Trigem Am. Corp., 431 B.R. at 867-68.   The Rood court also cited with approval

Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), 422

B.R. 783 (Bankr. S.D. Fla.2009), *quashed in part by,* 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part

and rev'd in part* 680 F.3d 1298 (11th Cir. 2012) (affirming the bankruptcy court's

determination as to the absence of reasonably equivalent value).  In re TOUSA, Inc., the

bankruptcy court observed:

> To make out the elements of a fraudulent conveyance claim, a plaintiff must
> prove that a debtor did not receive direct benefits reasonably equivalent to
> the value which it gave up. If the plaintiff meets that burden, the burden is
> then on defendants to produce (if they can) evidence that the debtors
> indirectly received sufficient, concrete value. *See* Welt v. Jacobson ( In re
> Aqua Clear Technologies, Inc.), 361 B.R. 567, 582 (Bankr. S.D. Fla. 2007)
> ("[o]nce the Trustee has made his prima facie case that a transfer constitutes
> a fraudulent transfer . . . the burden of producing evidence shifts to the
> transferee to demonstrate that the Debtor received a benefit or that there was
> some legitimate purpose for the transfer."). *The burden on Defendants includes
> a requirement to show that the "indirect benefits" were tangible and concrete, and
> to quantify their value with reasonable precision. See, e.g.,* Pummill v.
> Greensfelder, Hemker & Gale ( In re Richards & Conover Steel Co.), 267 B.R.
> 602, 614 (8th Cir. BAP 2001) ("party claiming to have delivered value must
> quantify it.").

In re TOUSA, Inc., 422 B.R. at 866 (emphasis supplied, footnote omitted).  *See, e.g.,* Clark

v. Security Pacific Business Credit, Inc. (In re Wes Dor , Inc.), 996 F.2d 237, 243 (10th

Cir.1993) (noting that defendant "fails to point to any evidence quantifying the amount of such [indirect] benefits");Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's Inc.), 188 B.R. 832, 843 (Bankr. D. Minn.1995) (once proven that consideration for transfer went directly to third party, defendant seeking shelter of "indirect benefit" defense bears intermediate burden of production as to the concreteness of the indirect benefit, and its reasonable equivalence in value).  The bankruptcy court in TOUSA, added:

> The language of section 548 is clear that "the debtor" must receive reasonably equivalent "value" "in exchange for" the transfer or obligation.  . . . That language means that an indirect benefit is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor," i.e., by an individual Conveying Subsidiary. A benefit received by some other entity does not automatically become a benefit received by the debtor merely because both entities are engaged in a common business enterprise. Rather, the touchstone of a cognizable indirect benefit is whether " 'the debtor's net worth has been preserved' and the interests of the creditors will not have been injured by the transfer." General Electric Credit Corp. v. Murphy (In re Rodriguez ), 895 F.2d 725, 727 (11th Cir. 1990) (quoting Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991). . . .
>
> Second, any purported "indirect benefits" defense must also be limited to cognizable "value." Section 548 does not refer to "benefits," whether direct or indirect. It requires reasonably equivalent "value" and includes a precise definition of "value" that encompasses *only* "property" and "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. §§ 548(a)(1)(B)(i), (d)(2)(A). Since this case does not concern the satisfaction of the debt of any Conveying Subsidiary, "property" received by a Conveying Subsidiary is the only value that is relevant here.
>
> Third, property must have been received by a Conveying Subsidiary "in exchange for" the transfer or obligation. Any "property" that a Conveying Subsidiary would have enjoyed regardless of the July 31 Transaction cannot be regarded as property received "in exchange for" the transfer or obligation.

In re TOUSA, Inc., 422 B.R. at 867-68.  The court in TOUSA, Inc. correctly observed in a

38

footnote that "the Conveying Subsidiaries could not receive 'property' unless they obtained some kind of enforceable entitlement to some tangible or intangible article." 422 B.R. at 868 n.55 (citing, inter alia, WEBSTER'S THIRD NEW INT'L DICTIONARY 1818 (1986) (defining "property" in its broadest sense as "something . . . in which or to which a person has a right protected by law")).

In this case, the Court, as a preliminary matter, rejects the Defendants' contentions that the burden of production cannot be shifted to them and they were not required to quantify the value of indirect benefits.  As the court noted in In re Tri-Star Techs. Co., Inc.,

> [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed . . . innocent creditors . . . ."

260 B.R. at 325-26 (citations omitted).  *See also* Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 994 (2nd Cir. 1981);[12] Nickless v. Pappas (In re Prime Mortg. Fin., Inc.), No.

---

[12] In Rubin, the Second Circuit observed:

> If the consideration given by the third party has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved . . . provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up. In . . .  these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred.

39

MW 10-035, 2011 WL 4572006 at *4 (B.A.P. 1st Cir. Feb. 14, 2011); <u>Official Comm. of</u>

<u>Unsecured Creditors v. Arlington Trust Co. (In re Lawrence Paperboard Corp.)</u>, 76 B.R. 866

(Bankr. D. Mass. 1987);[13] <u>Masco Bldg. Prods. Corp. v. Indisco, Inc.</u>, 2 Mass. L. Rptr. 125,

1994 WL 879787 at *2 (1994).

As the Trustee correctly argues, the Bankruptcy Code and the Uniform Fraudulent

Transfer Act are national in scope and decisions interpreting both statutes are relevant to

the issue of whether a fraudulent transfer can be avoided and recovered.  In <u>Braunstein v.</u>

<u>Walsh (In re Rowanoak Corp.)</u>, 344 F.3d 126 (1st Cir. 2003), the United States Court of

Appeals for the First Circuit recognized that while the burden of proof never shifts from

a trustee seeking the avoidance of a fraudulent  transfer, the burden of production is  a

"very different thing." <u>Id.</u> at 131.  Therefore, because the Trustee sustained her burden that

the Debtor did not receive reasonably equivalent value, she was not required to disprove

the Defendants' theory that the Mortgage payments were reasonably equivalent in value

to the services Mr. Jenoski provided to the Debtor.  The testimony was unrebutted that Mr.

---

<u>Id.</u> at 991–92.

[13] The court in <u>Lawrence Paperboard</u> stated:

"Neither Arlington nor the Committee attempted to quantify the
consideration passing to Harriman and Packaging in exchange for their
upstream and cross-stream guaranties. Clearly, such a quantification is
necessary because without it the Court cannot compare the consideration
given by Arlington and ostensibly passed through Lawrence to Packaging
and Harriman with the value of the guaranties given by Packaging and
Harriman.

<u>Id.</u> at 875.

Jenoski was primarily a salesman rather than a manager; he channeled his business acumen in selling printing services on behalf of DMI rather than overseeing the Debtor's production facility which was staffed by a full-time manager and shift supervisors. The Court concludes that when the burden of production shifted to the Defendants to quantify the value of services provided by Mr. Jenoski to the Debtor in relation to the Mortgage payments made to them by the Debtor, they did not sustain their burden of production.

The testimony as to the value of services provided by Mr. Jenoski to the Debtor was unconvincing and was insufficient to create a genuine issue of material fact. The Defendants proffered no written agreement between the Debtor and Mr. Jenoski as to his compensation, let alone an agreement to make the Mortgage payments as part of his compensation package. *Cf.* In re Prime Mortg. Fin., Inc., 2011 WL 4572006 at *4. Assuming that Mr. Jenoski performed services for the Debtor in exchange for the payment of his Mortgage debt, he admitted that he could not ascribe a value to those services. Mr. Jenoski did not testify that he would have ceased performing services for the Debtor if the Mortgage payments were not made. In addition, because value is determined as of the date of the transfer, Leibowitz v. Parkway Bank & Trust Co., 210 B.R. 298, 301–02 (N.D. Ill.1997), this Court would have to conclude that the value of the Mr. Jenoski's services fluctuated month to month in response to the payment option he elected when he caused the Debtor to make the Mortgage payments – an untenable inference. Moreover, the Defendants failed to produce any evidence, expert or otherwise, pertinent to the reasonableness of Mr. Jenoski's compensation from the Debtor, which was insolvent at the time it was making

41

Mr. Jenoskis' Mortgage payments ostensibly as compensation.  To the extent the Mortgage

payments were subsumed in corporate distributions, those distributions depleted the assets

of the corporation and harmed creditors. To the extent they were part of a bonus, there was

no testimony establishing the appropriateness of, or the appropriate amount of, a bonus

when the Debtor was experiencing financial difficulties that eventually caused it to close.

In sum, as Mr. O'Connor testified, the distributions were simply the total sum  of money

Mr. Jenoski took from the Debtor for Mortgage payments and other expenses both business

and personal.

Because Mr. Jenoski was unable to ascribe a value to services on behalf of the

Debtor, it was incumbent upon the Defendants to do more than rely upon the inconsistent

testimony of Mr. Jenoski.  Mr. O'Connor's testimony was unrebutted:  the distributions to

Mr. Jenoski made by the Debtor, which included the Mortgage payments, were the total

of monies Mr. Jenoski took from the company for personal expenditures.  Although some

of the distributions were cast as bonuses to avoid taxation, the rationale for the

distributions remained the same.

As noted above, the value of Mr. Jenoski's services must be reasonably equivalent

to the monthly Mortgage payments, which varied from month to month and year to year

in significant amounts.  In addition, the Mortgage payments reflected different payment

options available to the Jenoskis which were unrelated to any services performed by Mr.

Jenoski.  The Debtor's accountant testified that the Mortgage payments, were included for

tax and accounting purposes as distributions of profits to Mr. Jenoski,  the Debtor's sole

shareholder, and that those distributions depleted the assets of the Debtor. In addition, he recognized that Mr. Jenoski was paid an officer bonus in 2009 while Xerox Corporation was owed in excess of $1 million.

Reasonably equivalent value, though not defined in the Bankruptcy Code, is intended "to protect creditors against the depletion of a bankruptcy estate." In re TOUSA, Inc., 680 F.3d at 1311 (citing Gen. Electric Credit Corp. v. Murphy (In re Rodriguez), 895 F.2d 725, 727 (11th Cir. 1990)). Thus, a determination of whether indirect benefits suffice as fair consideration turns on whether the debtor's net worth has been preserved and creditors' interests have not been injured as a result of the transfers. The Defendants, who are relying upon the Debtor's receipt of indirect benefits, had the burden of producing evidence that the Debtor's net worth was preserved. They failed in that burden in light of the balance sheets which show the Debtor was insolvent for all the years in question.

In addition, the Defendants failed to produce evidence of the cognizable value of Mr. Jenoski's services asserting that the amount of the Mortgage payments equaled the value of those services. The Court rejects that premise for two reasons. The first is that the value of Mr. Jenoski's services as reflected in his salary from DMI remained constant while the purported value of his services to the Debtor in relation to the Mortgage payments fluctuated monthly. Significantly, the Court cannot find reasonably equivalent value for a temporal reason – the Debtor would not have been obligated to pay Mr. Jenoski for services after it ceased operations, although it made a Mortgage payment on the eve of closing its business.

43

The conclusion that reasonably equivalent value and indirect benefit are absent is supported by the circumstances of the Mortgage payments as reflected in the documentary evidence and Mr. Jenoski's inconsistent testimony. The Mortgage payments were included in distributions to Mr. Jenoski from the Debtor, as an "S" Corporation between 2005 and 2008. In other words, the distributions reflected the profits of the corporation, analogous to dividends, not earned income. In 2007 and 2008, Mr. O'Connor recharacterized at least a part of the distributions on the Jenoskis' tax returns as an "officer bonus" to avoid payment of New Hampshire tax on distributions. Nevertheless, in 2009 and 2010, Mr. Jenoski reported losses attributable to the Debtor and DMI in the amounts of ($467,488) and ($124,070).

For the foregoing reasons, the Court concludes that the Trustee sustained her burden of proof on counts III through VI of her Second Amended Complaint and that she is entitled to judgment as a matter of law.

C. Counts I and II

Under Massachusetts law, unjust enrichment is defined as "'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005)(quoting Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F.Supp. 340, 347 (D. Mass. 1982)).

In Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47 (1st Cir. 2009), the United States Court of Appeals for the First Circuit stated:

44

> In Massachusetts, a claim for unjust enrichment does not require
> consideration, but there must be "unjust enrichment of one party and unjust
> detriment to another party." <u>MEEI–II</u>, 412 F.3d at 234 n. 7 (internal quotation
> marks and citations omitted); *see also* 26 Samuel Williston & Richard A. Lord,
> A Treatise on the Law of Contracts § 68:5 (4th ed.1993) (establishing that
> unjust enrichment requires: (1) a benefit conferred upon the defendant by the
> plaintiff; (2) an appreciation or knowledge by the defendant of the benefit;
> and (3) acceptance or retention by the defendant of the benefit under the
> circumstances would be inequitable without payment for its value); <u>Stevens
> v. Thacker</u>, 550 F.Supp.2d 161, 165 (D. Mass. 2008). Massachusetts courts
> emphasize the primacy of equitable concerns in a finding of unjust
> enrichment or quasi-contract: "[C]onsidertions of equity and morality play
> a large part in constructing a quasi contract." <u>Salamon v. Terra</u>, 394 Mass.
> 857, 477 N.E.2d 1029, 1031 (Mass.1985).

<u>Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552 F.3d at 57.

In Massachusetts, restitution is an appropriate equitable remedy for unjust

enrichment. <u>Santagate v. Tower</u>, 64 Mass. App. Ct. 324, 329-30 (2005). Equitable remedies

are "flexible tools" to be applied to exact fairness and justice. *See* <u>Demoulas v. Demoulas</u>,

428 Mass. 555, 580 (1988).

In <u>Desmond v. Moffie</u>, 375 F.2d 742 (1st Cir. 1967), the United States Court of

Appeals for the First Circuit, while noting that the Massachusetts statutes of limitation

apply to suits in equity, considered whether an action to avoid a fraudulent conveyance of

real estate sounded in tort as the defendant contended and, therefore, was time barred by

the Mass. Gen. Laws ch. 260, § 2A. On appeal, the bankruptcy trustee asserted that the suit

was not time barred because it was founded on contract and thus was governed by the six

year statute of limitations set forth in Mass. Gen. Laws ch. 260, § 2. <u>Desmond v. Moffie</u>, 375

F.2d at 743. Citing, *inter alia*, <u>Blumenthal v. Blumenthal</u>, 303 Mass. 275, 21 N.E.2d 244

(1939), the First Circuit concluded that the limitations period was six years because "the

essential basis of the statutory proceeding to set aside a fraudulent conveyance is an indebtedness that could ordinarily be enforced in an action of contract." Desmond v. Moffie, 375 F.2d at 743.

Similarly, "[t]he statute of limitations applicable to unjust enrichment depends upon the "essential nature of plaintiff's claim.'" Epstein v. C.R. Bard, Inc., No. 03-12297-RWZ, 2004 WL 1598912 at *3 (D. Mass. July 19, 2004)(citing Desmond v. Moffie, 375 F.2d 742, 743 (1st Cir.1967)), aff'd, 460 F.3d 183 (1st Cir. 2006). See also Barber v. Fox, 36 Mass. App. Ct. 525, 529 (1994). Thus, either the three-year tort statute of limitations, see Mass. Gen. Laws ch. 260, § 2A, or the six-year contract statute of limitations may apply depending on the nature of the claim. See  Mass. Gen. Laws ch. 260, § 2.

The Trustee seeks $397,361.11, plus prejudgment interest relating to Counts I and II for unjust enrichment and money had and received.  In her Second Amended Complaint, the Trustee alleges that the Debtor enriched and benefitted Countrywide by making the Mortgage payments, that Countrywide "appreciated or knew" that the Debtor was providing benefits in the form of the transfers, that Countrywide "recognized, accepted, and retained all the benefits" of the transfers, that Countrywide retained benefits knowing that the Debtor, not the Jenoskis, made the Mortgage payments, that no  consideration flowed to the Debtor, and that it would be inequitable and unjust for Countrywide to retain the Mortgage payments where the Debtor (and its creditors) would suffer "unjust detriment" as a result.   Countrywide contends that there are issues of fact because it did not know or appreciated that the checks used to make the Mortgage payments were those

of the Debtor rather than the Jenoskis.  The Court rejects Countrywide's assertion that a

material issue of fact exists.  Countrywide is charged with notice of what was evident from

the face of the checks.  *See* Mass. Gen. Laws ch. 106, § 1-201(25).  Accordingly, the Court

concludes that the Trustee proved the elements required to establish that Countrywide was

unjustly enriched.

The Court concludes that the essential nature of the Trustee's Claim under Count

I is contractual, a conclusion that is consistent with the fraudulent conveyance claims set

forth in Counts III through VI.  Significantly, the Trustee referenced the absence of

consideration, an essential element of an enforceable contract.  She did not allege any type

of conversion or misappropriation warranting application of the statute of limitations

applicable to torts.  *Cf.* Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik

G.m.b.H. & Co.Kg., 448 F.Supp.2d 244, 263 (D. Mass. 2006), *aff'd,* 510 F.3d 77 (1st Cir. 2007),

*cert. denied*, 555 U.S. 815 (2008).  Accordingly, she is entitled to recover Mortgage payments

commencing with the December 2004 payment.[14]

In view of the Court's decision with respect to Count I, the Court concludes that the

Trustee is entitled to summary judgment on Count II as well.   According to the United

States Court of Appeals for the First Circuit,

> Money had and received is based on money, or its equivalent, which in
> "equity and good conscience" should be returned to the claimant and is often
> styled as money that should be returned "where one is unjustly enriched at
> another's expense." Rabinowitz v. People's Nat'l Bank, 235 Mass. 102, 126

[14] The Court has no evidence of any Mortgage payments made by the Debtor
preceding that date.

N.E. 289, 290 (1920). Unjust enrichment is an equitable claim with the same
elements save that it is not limited to enrichment by money, or its equivalent.
Trust Co. of Ga. v. S & W Cafeteria, 97 Ga.App. 268, 103 S.E.2d 63, 73 (1958).

Jelmoli Holding, Inc. V. Raymond James Fins. Servs., Inc., 470 F.3d 14, 17 n.2 (1st Cir. 2006).

D. Prejudgment Interest

The United States Bankruptcy Appellate Panel of the First Circuit set forth an in

depth discussion of when a successful litigant in an avoidance action may be entitlement

to prejudgment interest in Lassman v. Keefe (In re Keefe), 401 B.R. 520, 526-27 (B.A.P. 1st

Cir. 2009). The panel began by noting that granting prejudgment issue is discretionary,

that it is intended to be compensatory, and that "'courts have traditionally awarded

prejudgment interest to a trustee who successfully avoids a preferential or fraudulent

transfer from the time demand is made or an adversary proceeding is instituted.'" 401 B.R.

at 526 (citing Gray v. The Travelers Ins. Co. (In re Neponset River Paper Co.), 231 B.R. 829,

835 (B.A.P. 1st Cir. 1999). The panel then considered whether the applicable rate of

prejudgment interest should be the federal or state rate. It stated:

> Federal courts addressing the choice of law question often look to the source
> of a plaintiff's claim when determining the governing law of prejudgment
> interest: if federal law gives rise to the claim, federal law governs the rule of
> prejudgment interest to be applied. See Segal v. Gilbert Color Sys., Inc., 746
> F.2d 78, 82–86 (1st Cir.1984) (noting that award of prejudgment interest in an
> action arising under a federal statute is a matter of federal law). Similarly, if
> state law is the source of the claim then state law supplies the applicable rule
> of prejudgment interest. See Pereira v. Goldberger (In re Stephen Douglas,
> Ltd.), 174 B.R. 16, 22 (Bankr. E.D.N.Y. 1994) (where "the judgments are
> predicated on New York substantive law . . . prejudgment interest will be
> allowed ... at the New York [interest] rate").

Keefe, 401 B.R. at 526 (footnote omitted). The panel added:

48

Courts have reached different conclusions regarding whether federal or state law governs prejudgment interest in fraudulent transfer actions. Many have applied the state law interest rate for determining prejudgment interest on fraudulent transfer judgments arising under § 544(b). *See, e.g.*, <u>Von Gunten v. Neilson (In re Slatkin)</u>, 243 Fed.Appx. 255, 259 (9th Cir. 2007) (citing <u>Acequia, Inc. v. Clinton (In re Acequia, Inc.)</u>, 34 F.3d 800, 818 n. 4 (9th Cir. 1994)) (applying state law to determine prejudgment interest in case arising under § 544(b)); <u>Geltzer v. Artists Mktg. Corp. (In re The Cassandra Group)</u>, 338 B.R. 583, 600 (Bankr. S.D.N.Y. 2006) (concluding that because avoidance of a fraudulent transfer under § 544(b) is predicated on state substantive law, state law determines rate of prejudgment interest); <u>Geremia v. North Atl. Fishing, Inc. (In re Reposa)</u>, 186 B.R. 775, 777 (Bankr. D. R.I. 1995) (awarding prejudgment interest at rate provided by state law and postjudgment interest at federal rate); <u>Stephen Douglas</u>, 174 B.R. at 22. Other courts, however, have concluded that federal law is the applicable law for determining prejudgment interest on a fraudulent transfer judgment arising under § 544(b). *See, e.g.*, <u>CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)</u>, 393 B.R. 306, 336 (Bankr.W.D.N.Y.2008) (applying federal interest rate because the right to recover prejudgment interest on a fraudulent conveyance arises from § 550); <u>Brown v. Phillips (In re Phillips)</u>, 379 B.R. 765, 789 (Bankr. N.D. Ill. 2007); <u>Harlin</u>, 325 B.R. at 192–93; <u>Floyd v. Dunson (In re Ramirez Rodriguez)</u>, 209 B.R. 424, 434 (Bankr. S.D. Tex.1997) (awarding interest on the entire fraudulent transfer judgment arising under §§ 544(b), 550 and 548 at the federal rate). Where state law provides the substantive basis for a judgment, the Panel holds that state law should govern the determination of prejudgment interest.

<u>Keefe</u>, 401 B.R. at 526-27.  The panel observed that in the case before it the action was brought concurrently under 11 U.S.C. §§ 544(b) and 550 and state law.  It concluded that neither § 544(b) nor § 550 provided the substantive basis for the judgment.  Instead, it concluded that the substantive basis was the Massachusetts fraudulent conveyance statute, <u>id.</u> at 527, "as state law is the substantive law for the fraudulent transfer judgment, the bankruptcy court should have looked to state law to determine the applicable rate of prejudgment interest."  <u>Id.</u>  The panel stated:

Mass. Gen. Laws ch. 231, § 6B, governs the award of prejudgment interest in

49

tort actions. *See* <u>Gen. Elec. Co. Bus. Lighting Group v. Halmar Distribs., Inc.</u>
<u>(In re Halmar Distribs., Inc.)</u>, 232 B.R. 18 (Bankr. D. Mass. 1999) (citing
<u>Sugarman v. Sugarman</u>, 797 F.2d 3, 14 (1st Cir.1986)). The statute provides:

> In any action in which a verdict is rendered or a finding made
> or an order for judgment made for pecuniary damages for
> personal injuries to the plaintiff or for consequential damages,
> or for damage to property, there shall be added by the clerk of
> the court to the amount of damages interest thereon at the rate
> of twelve per cent per annum from the date of commencement
> of the action even though such interest brings the amount of
> the verdict or finding beyond the maximum liability imposed
> by law.

Mass. Gen. Laws ch. 231, § 6B. Based on the foregoing, the bankruptcy court
should have awarded prejudgment interest at the Massachusetts rate of 12%
from the date on which the Trustee sued the Appellant.

<u>Keefe</u>, 401 B.R. at 527.

In this case, the Trustee sought relief under both federal and state fraudulent
conveyance statutes.    Pursuant to <u>In re Keefe</u>, the Court finds that she is entitled to
prejudgment interest at the Massachusetts prejudgment interest rate. See Mass. Gen. Laws
ch. 231, § 6B.[15]

## V. CONCLUSION

In accordance with the foregoing, the Court shall enter summary judgment in favor
of the Trustee on all counts of her Second Amended Complaint.  The Court determines that

---

[15] The panel in <u>In re Keefe</u> referenced Mass. Gen. Laws ch. 231, § 6B which applies
to actions sounding in tort.  The Trustee referenced § 6C which applies to contract claims.
Although § 6C applies to Counts I and II, § 6B was held to apply to fraudulent
conveyances under state law in <u>Keefe</u>. Because the interest rate is the same, the Trustee's
reference to § 6C is harmless error. Alternatively, this Court need not determine whether
the fraudulent conveyance actions sound in tort or contract, although in <u>Desmond v.</u>
<u>Moffie</u>, the First Circuit indicated that such action sound in contract.

the Plaintiff is entitled to prejudgment interest as requested in Counts I and II pursuant to

Mass. Gen. Laws ch. 231, § 6C and prejudgment interest as requested for Counts IV and

VI pursuant to Mass. Gen. Laws ch. 231, § 6B.  Entitlement to postjudgment interest for

Count III and V are subsumed in the award of postjudgment interest under Counts IV and

VI.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 4, 2013